Good morning. May it please the Court, Charles Bonneau, appearing for Appellant Roland Adams. The issue that I would like to address today has to do with the tracing of assets from the victims or purported victims through the supposed conspiracy network and back to this This issue impacts the sentencing and the forfeiture, but I would like to focus on the forfeiture today. Not merely the tracing, but the amount of the tracing. Not merely whether a few dollars can be traced, but whether $2.1 million can be traced back to this defendant's deciding whether the forfeiture of his home is authorized on this record. Well, excuse me just one second. When you said that, I'm a little confused. You said whether $2.1 million can be traced back. That's not the amount that was traced to forfeit the house, was it? Somehow arguing that the whole amount has to be traced in order to make any of it No, we're going to be throwing around a bunch of different numbers today. I know. That's why I didn't want to start off confused. Okay. $2.1 million is the number they start with and they've adhered to in their briefing, so they're defending that line. That's the total amount of loss, but that's not the amount that the Misty Way house was valued at for purposes of forfeiting your client's interest. No, but they have to get up to most or all of his equity in the house in order to forfeit it, and we argue that they're coming out at a much lower number, and that's what I'd like to present. But the first threshold question is whether the issue's been waived by the plea agreement. The government argues that the plea agreement covers the forfeiture and that it was waived. However, the language used in the plea agreement applies to the, quote, conviction and sentence. No reasonable person reading that agreement would interpret conviction and sentence, which applies to the prison sentence, to apply also to the forfeiture. The two are reasonably distinguishable, and besides that, the agreement provides for a trial on the forfeiture. Normally, if you're going to have a trial, you're going to have an appeal. So for those two reasons, the language used and the structure of it, the fact that the two proceedings, the criminal sentencing was going down one track, the forfeiture was going down another track. There's nothing in this waiver that at all states that the forfeiture arguments that I'm presenting now are waived, so we think we can go forward on those. Now, the district court believed that the defendant had acknowledged a loss amount of $2.1 million, and I don't think that's a reasonable reading of the plea agreement either. The plea agreement was deliberately drafted to leave the loss amount unsettled. The agreement refers to a preliminary restitution figure, and that's where we get the $2.1 million that apparently was garnered through phone calls to different countries and so forth. But the final restitution figure, it was said, could not be calculated until after the pre-sentence report investigation. So the loss amount was reserved.  It is still subject to proof. In this area, the standard of proof, and I'm quoting now from this court's decision in U.S. versus 3814 Northwest Thurman Street, the standard of proof is, quote, reasonable grounds to believe that the property was forfeitable, supportable by less than prima facie proof, but more than mere suspicion, unquote. This standard is similar to probable cause in issuing a search warrant, and it may be based on hearsay. Are you, I'm still, see, I still have the same problem. I just want to be sure I understand. You keep going back to $2.1 million. Are we now talking about the loss amount for restitution purposes, or are you talking about a forfeitable interest in the Misty Way property? I believe the court came out with the same number. Oh, it found, whatever it was, $119,588 traceable to, of a conspiracy, proceeds from the conspiracy traceable to the Misty Way property. The government has taken the position initially $2.1 and then $1.2 million. For the loss amount for restitution. The forfeiture was based on a similar record, on similar allegations. And the, I'm not sure the source of that. Sounds like the equity in the home that was necessary to forfeit the property. But the tracing, the judge, who I argued in front of, always took the position that the loss amount was $2.1 million here. And that's what the government has defended. I understand that. The briefing. Maybe I can help clarify in my own mind by pursuing Judge Reimer's line of questioning. The total loss amount for purposes of sentencing really is a different question from the amount of money that can be traced and therefore provide a basis for a forfeiture order. Now, the money that's available to be traced for purposes of forfeiture, if I've understood the law properly, is it has to be money earned or, I should say, gained through the crimes for which he was convicted. Yes. And the $2.1 million, is that confined to the crimes for which he was convicted? As far as I can tell, the $2.1 million is their allegation of the loss from the conspiracy. Of the loss. It's not necessarily traceable to him. Okay. Well, let's go, maybe let's go at it this way. What are the specific amounts that you claim are traceable? And what are the specific amounts that you claim are not traceable into the purchase of the Misty Way house? The traceable amount is $1,100. They have used that as a, quote, example, unquote. But I don't think we can reason by example. We have to reason by inference. $1,000? $1,100 from the Arthurs. That went to a Mr. Boma Jones in South Africa. And then Mr. Boma Jones sent a similar amount to the defendant about the same time. That's an accurate tracing, at least. Assuming that the Arthurs, who were participants in a scheme to defraud someone of their inheritance, that they are properly listed as victims in this. But assuming that, then that's the link that they have established. Now, there were two wire transfers. One on the 3rd of April and one on the 16th of April. The first one on the 3rd for a little over $50,000 from Crystal Glass, Nigeria. The second one on the 16th, a little over $36,000, also from Crystal Glass, Nigeria. Do you contend that those are not traceable assets? That's correct. Well, we don't believe that there's proof of it. And I'm sorry, I wasn't counsel at this time. There was a letter that attempted to explain the source of the assets. And I haven't been able to find where that is in the record before the court. But the defendant made an effort to explain that as a loan that he received. And the district judge disagreed that that was a loan? Yes, yes. And that sounds like a finding of fact. The standard for proof on that is not beyond a reasonable doubt. It's more than suspicion. It's similar to probable cause for issuance of a search warrant. The court basically reasoned that if money went to some country in Africa and then the defendant received a check from a country in Africa, that it could be concluded that that was the same money or represented the proceeds of the money that was sent to the country in Africa. And in order for us to agree with you, we have to disagree with the district judge's fact finding? Yes. You have to, I think, characterize that as suspicion. If I saw that, I would be suspicious. I agree. And given the pattern of the fraud that was proved, this fits perfectly within that pattern? It fits. I'm not sure the pattern. If there's a pattern here, it's pretty broad. It apparently encompasses any wire transfer of money from a suspicious country. During a particular period? Of years, yes. Where he has little other source of legal income. That's also correct. He claims that there were loans involved, that he's got an extended family, and I don't know the whole nature of their finances. But if the district judge is right, and if we sustain the district judge's fact finding on this point, those two transfers on April 3rd and April 16th, those are traceable funds for purposes of forfeiture? If that's sustainable, that someone thinks that that comes from the... Yeah, that was my premise. I'm not asking you to agree with the premise. Yeah, so those were core amounts that were found in the forfeiture proceeding. There were many other amounts that were alleged, but other than this money coming from Africa, there's not a basis for a reasonable conclusion that this was connected. Now, the Arthur family, that example, that's an exception. And when we turn to the question of the sentencing, the 2.1 million falls to 1.2 million. A lot of these people, it seems, were not able to be located later, and in fact, changed the amount. That doesn't make any difference for purposes of sentencing, does it? Because the guideline is the same, whether it's 1.2 or 2.1. I think it casts some doubt on the whole procedure. What we're doing here... My question is, did it make any difference so far as sentencing was concerned? Because the guideline calculation is the same, regardless of which amount it is. Assuming it's proved that the 1.2 million amount, now that number is based on checking back by phone with people and finding how many of these people can still be located. One of these gentlemen claimed $600,000, and then he couldn't be located. The reason I mention this is we're kind of doing a reasoning against the defendant that if certain conduct must have been repeated along the same pattern, that's the reasoning process. And we would like to turn that around a little bit and look at the source and whether these are reliable claims. I'd like to reserve the rest of my time. Thank you. Ms. Skipper. Good morning. May it please the Court. I'm Camille Skipper, Assistant U.S. Attorney, and I represent the United States. To address the first issue with regard to perpetrator, it is the government's contention, as argued in our brief, that the defendant, as part of his plea agreement, waived his right to appeal his sentence. And the forfeiture, as this Court has previously found, is part of the sentence. There were not two tracks. There was one track. And his sentencing occurred at the conclusion of many acts. His plea, a pre-sentence report, a forfeiture trial, which was called for under the terms of the plea agreement, but there is nothing in the plea agreement and no reason to believe that his waiver of appeal does not apply to all parts of his sentence. This forfeiture was not carved out. But listen, I'm now reading to you from the waiver provision. Defendant understands the law gives him the right to appeal his conviction and sentence. He agrees as part of his plea to give up this right, that is to say conviction. He specifically gives up his right to appeal any fine and order of restitution. Forfeiture is not mentioned. No, Your Honor, but forfeiture is part of the sentence. But if we're talking about sentence and then we want to specify as to the monetary parts of it, fine and restitution are included, leaving out forfeiture, the burden of proof is on you to come forward and say that it's unambiguous. I think at a minimum it's ambiguous. I might even say it's unambiguous and you left it out. The language that you're quoting is the standard language which occurs in all of our plea agreements. Well, if you want the standard language to include forfeiture, you better amend it. Speaking only for myself at this point. I understand your point, Your Honor. Well, the problem is, too, it went on and specifically referred to other aspects, restitution being one of them, but not forfeiture. So it seems to me the clear implication is that forfeiture is a separate animal that wasn't included. I understand your point. It is our argument that the specificity which occurs after the general waiver of appeal doesn't somehow narrow the waiver. The specificity in that simply looks out for the defendant's benefit, his own understanding that these things are included. Well, and if you want to make him aware that forfeiture is included, as you wish to make him aware that fine and restitution were included, why didn't you say forfeiture? Your Honor, I did draft that plea agreement, and it never occurred to me that this issue would come up. It was my understanding all along going through the process that forfeiture was a part of the sentence. We never discussed this issue, so that's why it's not specifically drawn out in the plea agreement itself. But going beyond that to the specific issues of the forfeiture, Judge Reimer is correct. What the judge found in the district court was that $119,585 of the $134,000 down payment came from fraud proceeds. At this point, the $2 million number was not in play. Here we were talking simply about the amount of fraud proceeds that had gone into the house, and there we're talking about the amount of the down payment that the judge found after a forfeiture trial in which he took evidence and made factual findings. So at this point, the court would need to find that he clearly erred in making these factual findings, and I don't believe that the defendant can bring forth evidence to show that. He took evidence from the case agent himself, who in several instances discussed amounts of money that came from South Africa by wire transfer to the defendant, as well as amounts that came from Canada as postal money orders to the defendant. As far as the Bona Jones wire transfer, that is specifically identified in the factual basis of the plea agreement. However, you should be clear that the authors sent thousands of dollars. $1,100 was identified as coming from Bona Jones, but there were additional wire transfers from other individuals with all very similar addresses that came to the defendant using Western Union, and the agent testified that based upon his review of this information, it appeared that one person or a small number of people were making these wire transfers in various names, and the judge was entitled to take that into account in determining how much money Mr. Adams had, in fact, gained through the fraud. With regard to the crystal glass, I would simply note this. The agent testified that based on his investigation, the defendant had co-conspirators who were also in Nigeria. They were not all in South Africa. They were various countries, but he also testified that they were in Nigeria, and the judge considered that in determining that the amount of money, these thousands of dollars that were transferred to the defendant to support the purchase of the Misty Riverway residence were, in fact, fraud proceeds. He didn't draw that out of the air, and he didn't decide that simply because the money had come from Africa. He had testimony from the case agent in support of that. And then I would also note, as Judge Reimer noted, when it comes to the loss calculation, whichever figure you want to use, the $1.2 million for restitution purposes or the $2 million for loss, including intended loss purposes, the sentence is exactly the same. The calculation under the guidelines does not change. But defense counsel raised the issue of the $600,000 loss that he said the government wasn't able to substantiate. In fact, I recognize that loss. That's a loss that was reported to us from a gentleman in Japan. We were able to locate him, and in fact, an agent interviewed him, and there was testimony from the case agent about the information on that loss. But that wasn't simply garnered from the gentleman in Japan. There was evidence found on the defendant's computer, which the agent testified about, that substantiated this loss amount. Now, the defendant has always claimed that this is not a real loss, as he has claimed other losses aren't real losses. But evidence about this victim and this loss was found on the defendant's computer. The $1.2 million restitution figure wasn't simply garnered through telephone calls. We had victim witness statements that were provided to or actually gathered by the probation officer herself. And all of that information went into the $1.2 million figure. The difference between the intended loss figure and the restitution figure is not odd, particularly in a case like this, where you have victims worldwide, and there were a lot of victims who are embarrassed by their conduct in this case, not because they're co-conspirators, as the defendant wants to claim, but embarrassed by the losses they have suffered, and somewhat unwilling to admit to their own gullibility or their own greed. Let me get back on what for me, I'm afraid, is still a troublesome question, and let me get at it this way. For my own purposes, I understand the argument, and it seems to me that the district judge had sufficient basis for his factual finding for the two wire transfers from Crystal Glass, Nigeria, that those are ill-gotten gains and, therefore, traceable assets. What about the money from the proceeds of the Windbrook house, some of which were used for payment for the Misty River? Why are the proceeds from the sale of the Windbrook house forfeitable assets? Because the judge found that during the period of time in which he was, Mr. Adams, was making payments on the Windbrook house, he did not have legal employment, and he was, in fact, involved in the scheme back then and gaining benefits from it. But as I understand our case law, if you're going to do forfeiture, as distinct from other things, for example, sentencing because of overall loss and so on, if you're going to do forfeiture under our case law, it says it has to be for crimes of which there was a conviction, and that he pled guilty to a conspiracy beginning in February 2001, ending June 17, 2002. Well, he bought that Windbrook house in 99. Therefore, how do we say that the proceeds from the sale of the Windbrook house are forfeitable assets? Well, as an initial matter, the crime to which he pled guilty began on or no later than, as I recall. No later than February 26, 2001. But at the forfeiture... Does that mean he pled guilty to crimes before then? Well, that's a... It's a somewhat flexible beginning date because the government was not in a position and has never really been in a position to say exactly when the defendant began his crime. Only he and his co-conspirators can do that. But that we have evidence. But the only thing he does is to plead guilty to no later than. Yeah. Okay. Yes, and that's the evidence that we could... that during our investigation, we could concretely place at least the beginning of the fraud. But under your argument, he's also pled guilty to crimes in 1999? No, but this is a conspiracy which ranged over years. That's the argument here. In any event... But he wasn't charged with a conspiracy that ranged over the years that included the purchase of that house. That's true, Your Honor. But in any event, Judge Garcia also found that it was forfeitable as a substitute asset. And I believe... And I think that would take care of the court's concerns with regard to the traceable assets. But what the judge found at the forfeiture trial was that those proceeds then went into... were used to purchase... Because they were fraudulently gained, were used to purchase this property with other fraudulently gained assets which made this property forfeitable up to $119,000. And then made the separate finding that it was forfeitable as a substitute asset. Let me ask you this. Assuming that we find it traceable money and therefore forfeitable, the two fairly large amounts that came in from Crystal Glass adding up to $87,000 and change and the only amount seriously in dispute is the amount that came from Winbrook, you know, we're not talking about a lot of money given the scale of things. As a practical matter, why do you care? Well, I care because I believe that the judge made a good record in this case and I'm defending that record. As a practical matter, can you get at the house as an asset for purposes of restitution or is it in some way protected if you can't get at it through forfeiture trial? This is not a legal question so much as I'm just trying to figure out why you care. Well, there is an issue concerning the cost of forfeiting the property because this forfeiture is going to go toward restitution to the victims. We want to get as much as we can out of the house because even now victims are going to get pennies on the dollar. But I guess my question is assuming he has some assets not subject to forfeiture but those are assets and he has a debt that he's required to do in restitution, what limitations are there on you or on the victims in getting other assets, non-forfeitable assets, other assets available for purposes of restitution? I think we've got all the assets. This was not the only asset that we forfeited. Prior to the forfeiture trial the defendant agreed to forfeit some accounts as well. I don't believe that there are any other assets. Maybe you don't understand my question yet. I may not be asking it very well. You're going to get some money out of this house pursuant to forfeiture. But let's assume for purposes of my question that some money will not be gotten pursuant to the forfeiture and that he will have some value still in that house not subject to forfeiture. Nonetheless, he still owes restitution. Can you use the restitution order as a mechanism for attaching value in the house that is not subject to forfeiture? My inclination is to say I don't think so, but I am not positive. To put numbers on it, I think if Judge Fletcher were correct, you would have $87,000 as contrasted with $119,000 that was traceable. Does that make a difference? I mean, sure it makes a $32,000 difference, but other than that is there any other consequence? Not that I can think of right now, but I would still argue that the forfeiture is a substitute asset. It should allow us to forfeit the entire property. Up to this point, our I would note this the judge's findings with regard to the lost amount of forfeiture were not made out of the air and they weren't made simply based upon the this judge held two evidentiary hearings. One was the forfeiture trial. He also took testimony from the case agent during the naturalization fraud trial and the bulk of that testimony on cross-examination dealt with the nature of the fraud scheme, tying various victims to Mr. Adams, the flows of funds back and forth out of the country and back into the country to Mr. Adams and the case agent's analysis of Mr. Adams' bank records and the lack of any legitimate income shown there and how Mr. Adams had used fraud proceeds to basically fund his lifestyle. So I would stress that at the time that the judge made his factual findings, he had all of that in mind and he on the record made very clear that he had all of that in mind as well, having sat through both the trial and the forfeiture trial and the naturalization fraud trial. Up to this point, we've talked about the loss and the forfeiture. If the court has any questions concerning the other issues, I'll be happy to address those. I don't think so. Thank you. Thank you, Your Honor. Mr. Bernal. Thank you. I'd like to address a couple of questions that just came up. Are there other consequences? Yes. They need the equity in order to forfeit this house on the Misty River House. We're talking about a family home. So if they only have a small percentage of the total equity that they can attribute to the scheme, then they're not going to be able to justify a forfeiture and I think it should be remanded for that purpose if there's no support. How much equity, putting aside the forfeiture, how much equity does Mr. Adams have in this house? I thought that he owned it I don't know. I don't have those numbers. I don't want to say what my impression was. But there could be this other consequence that they need the Winbrook equity and they can't attribute it to the time frame of the conspiracy. The only... I don't understand you because the indictment charged a conspiracy that began no later than February 2001, right? I believe so. There were no specific dates on which any particular fraudulent act went down. So the point is a conspiracy began at some point continued through the period February 2001 forward. At the evidentiary hearing on the forfeiture, there was evidence of the same sort of criminal activity engaged in going back to 1997 1998. And there was evidence that your client had no legitimate source of income period for that time period. He never said otherwise. So why is it the case why isn't it the case that here in the evidentiary hearing the district court's findings based upon that evidence are plainly supported that the equity in the Winbrook property was acquired the same way through no legitimate source of income? Now we're getting away from the Lagos wire transfers and we're back into the 2.1 million. In other words, we're talking about all of these people that contributed money at different times. The question that I actually ask which is that the indictment charges a conspiracy that began sometime before February 2002 at the evidentiary hearing the record showed that it began like around 1997-98 the same kind of conduct occurred and the district court found that and found therefore that the equity that he got from the Winbrook property and popped into the Misty Way property was equally a proceed of unlawful activity. What's wrong with that? What's wrong with it is it's not traceable. Unlike the example the court apparently is satisfied with the district court's findings regarding the Lagos wire transfers. There were no findings regarding any of these other people who are rather shadowy. I have to ask myself looking at this these schemes are devilishly clever. What would be wrong with putting into Mr. Adams' computer the name of one of the co-conspirators have him line up along with the other victims. That way this whole process becomes a closed circle. We wind up giving the money back to the people who originated the conspiracy. We're not confirming none of these people came to Sacramento. We don't we can't confirm their identities or their amounts and that's why we think the money is untraceable. If you get out of the Lagos the two Lagos wire transfers then you're in deep water. We're talking about people whose very existence is questionable. Excuse me. Let me ask you the follow up on Judge Vimer's question and reflected in the government's position. The indictment is odd because he pleads guilty to conspiracy beginning no later than Feb. 26, 2001 leaving open that the conspiracy began sometime earlier than Feb. 26, 2001. Is it open to the judge at the forfeiture hearing to conclude that the conspiracy began before the Feb. 26 date and therefore to apply funds obtained prior to that date to the forfeiture? I think that the judge was operating at least in part on the plea agreement which had already been signed by the time of the forfeiture. He'd already entered the plea agreement and signed it so it was in evidence against him. And so I think that the reasonable reading, it could technically be read to say yes it could be sometime in the distant past that this began but the reasonable reading of that language is that it began in Feb. 2001. That would be a reasonable person's reading of the language. What I'm working on is the potential ambiguity introduced by that odd wording in the start date because our case law is very clear that you have clean start date and clean termination date. You've got to prove that the assets subject to forfeiture were gotten by the, during the period of that, between the termination date and the claim conclusion, that is to say the conduct for which he was convicted. Here we've got a fuzzy start date. Well, we didn't draft the indictment or the agreement but we have our interpretation of it which under Spielman would be a reasonable person's reading of a contract which if there's no other date suggested would lead one to believe that it began in Feb. 2001. Well, it says no later than, leaving obviously open, I mean there's no ambiguity in the language, leaving open that it could have begun earlier. Well, to me that just heaps uncertainty upon uncertainty as far as where this money came from and where it went. An issue that the district court resolved by finding that it started as early as 97 or 98. We're not, the question is whether there is a probable cause for that finding. I don't understand the probable cause. I mean, it's a preponderance of the evidence standard, isn't it? Ah, it's roughly that, yes. No more than that. Thank you very much. The matter just argued will be submitted in the next year argument in Verizon. Thank you.
judges: Rymer, T.G. Nelson, W. Fletcher